Estate of D. E. Hamiel, Deceased, The Ohio National Bank of Columbus, Executor v. Commissioner.
Estate of Hamiel v. Commissioner
Docket No. 50607.
United States Tax Court
T.C. Memo 1956-235; 1956 Tax Ct. Memo LEXIS 57; 15 T.C.M. (CCH) 1225; T.C.M. (RIA) 56235; October 25, 1956
*57 (1) Held: The partnership created by the taxpayer and his uncle in 1943 and which lasted until the uncle's death in 1946 is recognizable for federal income tax purposes. (2) The taxpayer created a trust in 1943 pursuant to a divorce decree, the income of which was to be applied by the trustee for the maintenance and education of the taxpayer's minor son. The trust assets were leased to the partnership of which the taxpayer and his uncle were partners. Trust income was credited on the books of the business to the account of the minor son. The trustee died in 1943 and no successor was appointed until 1947. In the meantime the taxpayer was in control of the trust assets and made such payments from the income of the trust as shown on the books as he saw fit, debiting the account therefor. All income was not expended. Held: The entire trust income was taxable to the taxpayer. Roger K. Powell, Esq., 17 South High Street, Columbus, Ohio, and Robert E. Patterson, Esq., for the petitioner. Robert E. Johnson, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies in the petitioner's income tax: Year
Deficiency
1943
$16,848.47
1944
6,487.00
1945
13,694.61
1946
6,669.70
*58 Certain adjustments made by the Commissioner are not contested on brief and are taken to be conceded. There are two issues for determination: (1) whether a partnership recognizable for income tax purposes existed between the taxpayer and his uncle from 1943 until the uncle's death in 1946; and (2) whether the income of a trust created by the taxpayer for the maintenance and education of his son is taxable to the taxpayer. The tax returns for the years involved in this proceeding were filed with the collector of internal revenue for the eleventh district of Ohio. Findings of Fact Those facts and exhibits which are stipulated are so found and are incorporated herein by this reference. The petitioner is the Estate of D. E. Hamiel, Deceased, formerly a resident of Columbus, Ohio. D. E. Hamiel, also known as Dorman E. Hamiel, died on January 29, 1950 at the age of fifty-four. On November 29, 1933, the Steri-Seal Corporation, hereinafter referred to as Steri-Seal, was incorporated under the laws of Ohio. It was organized to market and distribute glass caps to fit over rubber nipples on babies' nursing bottles. Dorman was the promoter of the glass caps and by agreement the Illinois Glass *59 Company manufactured them. On December 7, 1933, Steri-Seal's 250 shares of no par common stock were issued as follows: Herbert C. Zelsman
124 shares
C. J. Zelsman
1 share
D. E. Hamiel
123 shares
E. E. Hamiel
1 share
J. W. Hamiel
1 share The certificate for one share held by E. E. Hamiel was endorsed in blank with no date of transfer shown thereon. On April 1, 1937, Herbert C. Zelsman and C. J. Zelsman transferred to Dorman the 125 shares of Steri-Seal held by them. During the years 1937 to 1942 Dorman's first wife, Helen, worked for Steri-Seal. She ordered products, billed customers, handled the correspondence and kept the books of the corporation. E. E. Hamiel, also known as Elmer E. Hamiel, who was Dorman's uncle and who had retired from active business in 1929 also worked for Steri-Seal from 1937 to 1942. During that time his activity was limited to opening the office in the morning, packing and shipping the product, and closing the shop at night. Steri-Seal's corporation income tax returns showed that Elmer was not paid a salary from 1937 to 1941 and that in 1942 he was paid a bonus of $2,400. Helen cashed Elmer's bonus check for $2,400 and placed the proceeds in a safety deposit box in *60 her name and Dorman's. Elmer did not have access to the box. From 1937 to 1942 Dorman was not active in the management of Steri-Seal. On June 22, 1942, Dorman filed a petition for divorce from Helen in the Court of Common Pleas, Franklin County, Ohio. Phil S. Bradford was his attorney. On July 17, 1942, Helen filed an answer and cross petition for divorce. Subsequent pleadings of these parties were filed on July 24, 1942 and July 29, 1942. On December 22, 1942, Bessie and Herbert Pepper conveyed to Elmer, by warranty deed, part of lots 19 and 22 in Pugh's Subdivision. Dorman's name was originally on the deed as grantee but it had been erased and Elmer's name written in its place. There was a mortgage on the property with the Buckeye Federal Savings and Loan Bank. Its loan record showed Dorman to be the mortgagor. On January 6, 1943, Dorothy and George Byers conveyed to Elmer, by warranty deed, part of lot 17 in Pugh's Subdivision. There was a mortgage on the property with the Buckeye Federal Savings and Loan Bank. Its loan record showed Dorman to be the mortgagor. On January 18, 1943, Elmer conveyed to Dorman, by quit claim deeds, the parts of the three lots in Pugh's Subdivision which *61 he had acquired from Bessie and Herbert Pepper and Dorothy and George Byers. On January 8, 1943, Helen was granted a divorce from Dorman on the grounds of extreme cruelty. A separation agreement which was incorporated into the divorce decree provided in part as follows: "NOW, THEREFORE, in consideration of the premises and of the agreements of the said Helen E. Hamiel, herein contained, the said Dorman E. Hamiel agrees with the said Helen E. Hamiel, as follows: "(1) That he will immediately assign and deliver, or cause to be assigned and delivered, one hundred twenty-four (124) shares of the capital stock of Steri-Seal Corporation to Phil S. Bradford, as trustee, for the use and benefit of said minor child, Dorman E. Hamiel, Jr.; * * * The net income from said stock shall be held by the trustee and by him applied to and for the maintenance and education of said minor child, in addition to all other payments provided herein for him. * * * "(2) That he will pay to said Helen E. Hamiel, for the support and education of said minor child, Dorman E. Hamiel, Jr., the sum of $115.00 per month, payable on or before the 20th day of each and every calendar month hereafter, until said minor child *62 shall attain the age of twenty-one years; * * * "(3) That for the purpose of providing for the support of said minor child until he shall attain the age of twenty-one years, said Dorman E. Hamiel will effect life insurance on his life in a suitable and proper company in the sum of Five Thousand ($5,000.00) Dollars, irrevocably designating the said Dorman E. Hamiel, Jr. as the beneficiary therein; that he will deliver the policy or policies of such insurance to the said Phil S. Bradford, as trustee, within ten days from the date hereof, and that he will pay, promptly when due, all premiums and do all things necessary to keep such insurance in full force and effect during the life of said minor child or until he attains the age of twenty-one years; * * *" Dorman signed a "Trust Indenture" dated January 6, 1943, which provided as follows: "KNOW ALL MEN BY THESE PRESENTS, that I, Dorman E. Hamiel, of Columbus, Ohio, for and in consideration of One Dollar ($1.00) in hand paid, the receipt of which is hereby acknowledged, and of other good and valuable considerations to me, have granted, sold, delivered and transferred unto Phil S. Bradford, as trustee, and in trust, One Hundred Twenty-Four *63 shares of the common capital stock of Steri-Seal Corporation. "To have and to hold said stock in trust for the following uses and purposes: To hold said shares of stock hereby granted and to collect the income therefrom, and after paying thereout all necessary and proper costs and expenses, including a reasonable fee for the services of the Trustee, to pay over the net income thereof to or for the benefit of Dorman E. Hamiel, Jr., my son, until he attains the age of twenty-five years, or until his death if death occurs sooner. When said son arrives at the age of twenty-five years, said shares shall be delivered and transferred unto said son, and thereupon this trust shall terminate. "This trust is created for the purpose of carrying out the conditions of a separation agreement entered into by and between said Dorman E. Hamiel, and his wife, Helen E. Hamiel, under date of January 6th, 1943, in respect of said stock a copy of which separation agreement is hereto attached and made a part thereof. "Said Trustee shall have the full right and power to vote said shares of stock at any meeting of share holders and in all other respects to manage and control said shares in a manner provided *64 by law for ownership of stocks." Pursuant to the "Trust Indenture" 124 shares of Steri-Seal common stocks was issued to Phil S. Bradford, Trustee of Dorman E. Hamiel, Jr. On February 15, 1943, Steri-Seal was dissolved. On September 16, 1943, Elmer signed his last will and testament which directed that all his just debts and funeral expenses be paid and thereafter gave and bequeathed to his nephew, Dorman, all of his property which he had the right to dispose of at the time of his death. On or about September 17, 1943, Elmer and Dorman signed a "Partnership Agreement" dated February 15, 1943 which provided in part as follows: "1. That the parties hereto shall, as partners, engage in and conduct the business of selling, manufacturing, and distributing nursing bottle caps or any allied business or products in connection therewith. * * *
"4. That the capital of the partnership shall be the sum of * * * ($2,864.24), and the contributions by each party shall be as follows, * * * D. E. Hamiel
$1,432.12
E. E. Hamiel
1,432.12
$2,864.24
* * *
"6. It is mutually understood * * * that certain assets representing 124/250ths of the former Steri-Seal Corporation, which are to be used in the conduct of this *65 partnership, shall not represent assets of the partnership, but shall be operated by the partnership under the terms of a certain lease with D. E. Hamiel II, * * * "7. That the net profit or net loss shall be divided between the parties hereto, * * * as follows: "D. E. Hamiel
Fifty per cent (50%)
E. E. Hamiel
Fifty per cent (50%)" Elmer's capital contribution to the partnership was made by Dorman. On or about September 17, 1943, a "Lease" dated February 15, 1943 was signed by Phil S. Bradford as Trustee for Dorman E. Hamiel II and by Dorman and Elmer as members of a partnership, which provided in part as follows: "1. Phil S. Bradford as Trustee for the use and benefit of Dorman E. Hamiel II hereby grants and leases to said partnership the right to that portion of the assets which came to said Trustee upon the dissolution of said Steri-Seal Corporation. "2. Said partnership hereby agrees to pay to Phil S. Bradford as Trustee for the use of said assets, annually or otherwise, 30% of the profits of the said partnership by way of rental of said assets. "3. It is further agreed that in arriving at the profits of said partnership, the said partners will not deduct any moneys by way of individual *66 salaries or bonuses for said partners. "4. It is further agreed that should death of E. E. Hamiel dissolve this partnership, D. E. Hamiel shall have the right to renew this lease." On December 21, 1943, Phil S. Bradford died. No successor trustee was appointed until June 20, 1947. Elmer's personal account with the partnership was shown on its books to be as follows: E. E. HAMIEL PERSONAL ACCOUNT
1943
Dr.
Cr.
Sept. 15
Income tax-declaration
$ 3,395.14
Nov. 19
E. E. Hamiel
2,000.00
Nov. 27
E. E. Hamiel
5,000.00
Dec. 15
Income tax declaration
2,795.14
Dec. 22
E. E. Hamiel
15.00
Dec. 31
To capital a/c
$13,205.28
$13,205.28
$13,205.28
1944
Apr. 28
E. E. Hamiel
$ 300.00
May 29
E. E. Hamiel
500.00
June 28
E. E. Hamiel
500.00
Aug. 29
E. E. Hamiel
1,000.00
Oct. 26
E. E. Hamiel
500.00
Nov. 22
E. E. Hamiel
1,000.00
Dec. 26
E. E. Hamiel
500.00
Dec. 31
To capital account
$ 4,300.00
$ 4,300.00
$ 4,300.00
1945
Jan. 15
Income tax amd. Dec. 44
$ 519.74
Mar. 12
Income tax 45 Dec.
250.00
Apr. 16
Grant Hospital
49.00
Apr. 25
Pauline Hightower, nurse
56.00
Apr. 27
Elsie Carter, nurse
56.00
Apr. 27
C. R. Soller, nurse
56.00
May 2
Pauline Hightower, nurse
56.00
May 2
Elsie Carter, nurse
48.00
May 2
C. R. Soller, nurse
56.00
May 2
Grant Hospital
109.95
May 4
Martha Kinser, nurse
8.00
May 9
Pauline Hightower, nurse
56.00
June 4
Lydia Lucas
100.00
June 5
Saner & Saner
210.00
June 5
Dr. R. E. Walsh
28.60
June 9
H. O. Bratton, M.D.
20.00
June 15
Income tax 45 Dec.
250.00
July 31
Check returned, nurse overpaid
$ 56.00
Aug. 13
Dr. Robt. E. Welsh
3.00
Sept. 14
Income tax 45 Dec.
250.00
Oct. 24
2,000.00
Oct. 25
Dr. Robt. E. Welsh
25.60
Nov. 27
1,000.00
Dec. 19
1,300.00
Dec. 31
To capital account
$ 6,451.89
$ 6,507.89
$ 6,507.89
1946
Jan. 31
Income Tax
$ 740.65
Apr. 30
Income Tax
1,878.56
Apr. 30
Lydia Lucas
272.00
Apr. 30
Withdrawal
2,200.00
May 31
Nurses
147.00
May 31
Income tax 46 Dec.
200.00
June 1
Percy Lucas, Medical expense
56.00
June 1
Karel de Monye, Medical expense
100.00
June 1
Mrs. Groves, Medical expense
52.50
June 1
To capital account
$ 5,646.71
$ 5,646.71
$ 5,646.71
*67 Near the end of 1942 Steri-Seal employed a new girl to replace Helen Hamiel. Early in 1943 the partnership hired a new man to work in the store room and shipping room. From that time on Elmer's activity at the partnership's place of business consisted of opening the shop in the morning, reading the mail and then routing it, writing up bills of lading, checking invoices, answering some of the correspondence, and closing the shop at night. Elmer also had many conferences with Dorman in regard to the conduct of the business. In April of 1945 Elmer entered the Grant Hospital in Columbus for approximately two weeks to have an operation for removal of a cataract on his right eye. After the operation Elmer was not as active as before, but he kept on working until he could no longer see. On June 1, 1946, Elmer died at the age of 83. The doctor who attended Elmer from April 13, 1946 until his death found that the condition directly leading to death was coronary occlusion with the antecedent causes being coronary arteriosclerosis and senility. Three Probate Court appointed appraisers inventoried Elmer's property as follows: Personal Goods and Chattels: One-half interest in partnership
$ 9,934.28
Money: None
Securities: None
Real Estate: None
Accounts and Debts Receiv-
able: Note of D. E. Hamiel
- dated
11/22/44
$ 1,000.00
12/26/44
500.00
10/24/45
2,000.00
8/29/44
1,000.00
10/26/44
500.00
11/27/43
5,000.00
6/28/44
500.00
11/19/43
2,000.00
12/19/45
1,300.00
11/27/45
1,000.00
Ohio National Bank -
check acct.
238.27
Total Inventory and Appraisement
$24,972.55
*68 Dorman, as executor, paid an Ohio Inhertance Tax in the amount of $1,067.02 on Elmer E. Hamiel's estate. After 1942, Dorman, when he was in Columbus, would usually go to the partnership's office during the day, but he rarely stayed more than a half hour. He traveled a great deal selling the glass caps. In December of 1944 Dorman was married to Martha Hamiel; they went to Florida for four months that winter on a combination business trip and honeymoon. After Elmer's death, Dorman's selling trips were shorter and less frequent. The partnership filed income tax returns for the years 1942 through 1946. Elmer filed income tax returns for the years 1943 through 1945. Dorman, as executor of Elmer E. Hamiel's Estate, filed an income tax return for the year 1946. These returns reported partnership income and income taxes paid, as follows: Partnership
Income
Year
Income
Taxes Paid
1943
$15,186.97
$5,392.10
1944
7,671.67
1,761.65
1945
12,069.67
3,378.56
1946
3,416.23
390.98
During the years 1943 through 1946 Helen had difficulty in obtaining money from Dorman for the support and maintenance of their son, Dorman E. Hamiel II, as was required by the divorce decree. Dorman would allow months to pass in which he *69 made no payments. Sometimes these payments were made later, other times they were not. The partnership's books had an "Accounts Payable, Leased Funds, & D. E. Hamiel II, Personal" account which is summarized as follows: Year
Dr.
Cr.
Balance
1943 War Bonds
$ 750.00
Income Taxes
5,120.36
Rental, Leased Funds
$12,959.54
Balance
$ (7,089.19)
1944 Income Taxes
920.22
Real Estate Taxes
73.44
Rental, Leased Funds
6,520.42
Balance
(12,615.94)
1945 Income Taxes
1,243.04
Real Estate Taxes
227.15
Mortgage Payments
374.88
Rental, Leased Funds
10,277.72
Balance
(21,048.59)
1946 Income Taxes
2,572.61
Real Estate Taxes
117.12
Miscellaneous
82.19
Mortgage Payments
562.32
Tax Settlement - Steri-Seal
2,165.87
Rental, Leased Funds
8,663.69
Balance
(24,212.17)
1947 Income Taxes
1,766.15
Real Estate Taxes
125.18
Miscellaneous
456.31
Mortgage Payments
515.46
To Trustee
5,390.38
King Thompson Lots
3,200.00
Rental, Leased Funds
7,166.37
Balance
(19,925.06)
Dorman filed income tax returns for Dorman E. Hamiel II for the years 1943 through 1946. They disclosed the following: Gain on Liqui-
Income
Rental
dation of Steri-
Tax
Year
Income
Seal Corp.
Paid
1943
$12,959.54
$2,768.79
$5,229.61
1944
6,520.42
1,400.92
1945
10,277.72
2,672.76
1946
8,663.69
1,766.15
No fiduciary returns were filed *70 for the years 1943 through 1947 for the trust. The partnership and Dorman as sole proprietor took deductions for rents on their returns for the years 1943 through 1947 in amounts which were approximately equal to the amounts reported as income on the returns filed for Dorman E. Hamiel II. The Commissioner determined that a partnership, recognizable for income tax purposes, did not exist between Dorman and Elmer during the years 1943 through 1946. He also determined that the income of the alleged trust created for Dorman E. Hamiel II was taxable to the grantor, Dorman, for the years 1943 through 1947, under the provisions of sections 22(a) and/or 167 of the Internal Revenue Code of 1939. Accordingly, he increased Dorman's gross income for those years as follows: Increase Due
Increase
Year
to Partnership
Due to Trust
1943
$14,351.00
$13,244.65 *
1944
6,756.43
5,713.53
1945
12,291.57
9,546.09
1946
2,666.23
8,663.69
1947
7,166.37
Ultimate Findings Elmer substantially contributed to the management and control of the partnership and also contributed vital services to it. Elmer and Dorman in good faith, and for the purpose of conducting the *71 business of selling, manufacturing and distributing nursing bottle caps intended to and did join together in the conduct of such enterprise from 1943 until Elmer's death in 1946. Opinion TIETJENS, Judge: The first issue involves the question of whether the partnership formed by Dorman and Elmer in 1943 which lasted until Elmer's death in 1946 was a valid partnership during those years, for federal income tax purposes. Both parties rely on Commissioner v. Culbertson, 337 U.S. 733 (1949). In that case the Supreme Court stated: "The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case, but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present *72 conduct of their enterprise. * * *" The Commissioner argues that the partnership formed by Dorman and Elmer was nothing more than a sham transaction entered into by the parties in order to avoid income taxes. To support his position he points out that Elmer did not make a capital contribution and that Dorman contributed the entire capital of the partnership. He argues that Elmer did not perform services in the capacity of a partner but only performed negligible services to hold his interest during the last years of his life, he being eighty years old when the partnership was formed. He argues further that Dorman had complete dominion and control over both Elmer and any property placed in the latter's name; thus Elmer was only a "front" or "straw man" for Dorman. To substantiate this last position he relies on the following: first, Elmer endorsed in blank the one share of Steri-Seal stock issued to him in 1933; second, when a $2,400 bonus check was given to Elmer in 1942, he allowed the proceeds to be placed in Dorman's safety deposit box; third, while Dorman was involved in a divorce proceeding Elmer took title to parts of three lots of real estate which he conveyed, after the divorce *73 decree, to Dorman, the real owner; fourth, the partnership agreement though dated February 15, 1943 was not signed until September 17, 1943, over seven months after Steri-Seal was liquidated, which is, he claims, under normal and ordinary business practice, too long a period to decide the interests of two people in a partnership if each is performing legitimate services for the business; fifth, $14,800 in profits withdrawn by Elmer were loaned to Dorman without interest and were never repaid, while other withdrawals by Elmer for the payment of income taxes and medical expenses were nominal; and sixth, one day prior to the execution of the partnership agreement Elmer made a will leaving everything to Dorman and nothing to his niece with whom he had long roomed. In the circumstances, however, the Commissioner's arguments do not necessarily indicate that Elmer and Dorman did not intend to create a valid partnership. The fact that Elmer's capital contribution was the result of a gift from Dorman does not alone prevent him from being a partner. Commissioner v. Culbertson, supra. This is especially so since we found as a fact that after Dorman's first wife, Helen, left Steri-Seal in 1942 *74 due to the divorce proceedings commenced by Dorman that year, Elmer became much more active in the conduct of the business. He assumed many of Helen's former responsibilities. The facts show that Elmer substantially contributed to the management and control of the partnership and also contributed vital services to it. This is sufficient to demonstrate a valid partnership for federal income tax purposes. Commissioner v. Tower, 327 U.S. 280 (1946). While not controlling, at least some weight may be given to the fact that the formalities of a partnership were observed by the parties. A partnership agreement in writing was made; partnership returns of income were filed for each of the years; Dorman and Elmer reported partnership income on their individual income tax returns and paid taxes thereon; and Elmer's interest in the partnership and the notes receivable from Dorman were included in his estate and an Ohio Inheritance Tax paid thereon. Also, Elmer withdrew $14,803.88 of his partnership profits which he used to pay income taxes, medical bills, and other miscellaneous personal expenses. The Commissioner's argument that Elmer was only a "front" or "straw man" for Dorman is unwarranted *75 in light of all of the facts. We hold that Elmer and Dorman in good faith and for the purpose of conducting the business of selling, manufacturing and distributing nursing bottle caps intended to and did join together in the conduct of such enterprise from 1943 until Elmer's death in 1946. Accordingly, the Commissioner was in error in ascribing to Dorman Elmer's share of the partnership income during the years in question. The second issue involves the question of whether the income from the trust which was created pursuant to the divorce of Dorman and Helen is taxable to the grantor, Dorman. The Commissioner determined that it was includable in Dorman's income under section 22(a) and/or section 167 of the Internal Revenue Code of 1939. The facts with reference to this issue are hereinafter summarized. Helen was awarded a divorce from Dorman in January of 1943. The divorce decree incorporated an agreement whereby Dorman was bound to transfer 124 shares of Steri-Seal stock to Phil S. Bradford as trustee for Dorman E. Hamiel II, a minor child, with the income from such stock to be applied to and for the maintenance and education of the child. Dorman also agreed to pay to Helen $115 *76 per month for the support and education of their son and to take out $5,000 life insurance with Dorman II as the irrevocable beneficiary for the purpose of providing his support. The trust was created pursuant to the agreement and, under its terms, the income was to be paid over to or for the benefit of Dorman II until he attained age 25 at which time the corpus was to be transferred to him. Steri-Seal was dissolved shortly thereafter and a proportionate share of the assets representing the 124 shares of stock held in trust were leased to the partnership which succeeded the corporation. The lease called for a rental payment equal to 30 per cent of the income of the partnership. Phil S. Bradford, the trustee, died in December of 1943 but no successor was appointed until June of 1947. The books of the partnership up to the time of Elmer's death and then those of Dorman as sole proprietor showed rents owing to the trust and amounts paid for the benefit of Dorman II as follows: Total
Year
Rents
Payments
Balance
1943
$12,959.54
$ 5,870.36
$ 7,089.19
1944
6,520.42
993.66
12,615.94
1945
10,277.72
1,845.07
21,048.59
1946
8,663.69
5,500.11
24,212.17
1947
7,166.37
11,453.48
19,925.06
The petitioner argues that Dorman *77 created a valid irrevocable trust, the income of which is taxable to the trust or its beneficiary, and not to Dorman. He does concede however, that any trust income which was actually used for the support and maintenance of Dorman II is properly includable in Dorman's income. If it were necessary to do so, we think there is sufficient evidence of record to support a conclusion that the creation and operation of the alleged trust lacked substance. The assets comprising the trust corpus were retained and used in the business of the partnership as long as it continued and then in Dorman's sole proprietorship and for all that appears, were thus under Dorman's control and domination. No payments for the use of these assets were ever made directly to the trustee and, as a matter of fact, the trust had no trustee at all from December of 1943 to June of 1947. No fiduciary returns were ever filed for the trust. The trust income was not designated as such on the books of the business but was carried as "Accounts Payable, Leased Funds & D. E. Hamiel II, Personal." This account was credited with the amounts for "Rental, Leased Funds" shown in our findings of fact and charged with the items of *78 expenditure also shown there. The credited amounts were not treated by Dorman as trust income but were returned as the personal income of the minor son in tax returns filed by Dorman on behalf of his son. The charges made against the account apparently were under the control and made at the discretion of Dorman both as to amount and purpose. In other words, except for the formalities of the transfer and the lease agreement, the grantor never treated the arrangement as a trust at all and we think this factual background would warrant a holding that the trust was no more than a shell and that Dorman himself is properly taxable with the income from the trust assets. However, we need not rest our decision on the above, for we think this case is controlled by the rule of Helvering v. Stuart, 317 U.S. 154. In fact it is a stronger case for the Commissioner than the Stuart case for there there was only a possibility that the income of the trust would be used to relieve the grantor pro tanto of his parental obligation, yet the entire trust income was taxed to the grantor. Here, reading the separation agreement which was included in the divorce decree together with the trust instrument (as *79 we think we must) it is clear that the entire net income of the trust was dedicated to the support and maintenance of the minor child. In such a case there is no room for applying the restriction of section 167(c)[1], that the grantor is to be taxed only on the amount of the trust income as is used for support and maintenance. See Gordon M. Mather, 5 T.C. 1001, affd. per curiam (C.A. 6) 157 Fed. (2d) 680. While not entirely clear, there is a suggestion in petitioner's argument that since no income was actually paid over to a trustee there was nothing to tax other than those amounts which may have been expended by Dorman for support and maintenance, and what these amounts were (whether *80 they included income taxes and expenditures for mortgage payments, etc.) is not agreed upon. This argument is without merit. The Commissioner determined that the grantor was taxable with the income of the trust. The presumption is that his action is correct. The books of the business give evidence that credits were made of income from the leased (trusteed) assets closely approximating the amounts as determined by the Commissioner. The petitioner has made no showing that such amounts were not earned by the trust or that the income was not available to Dorman if he saw fit to use it. The assets were under his control. He was the grantor of the trust. He in fact made payments out of the income of the trust assets as shown by the books whenever he saw fit to do so. We see no escape from the conclusion that there was income from the trust which under the terms of the trust was to be totally applied to the maintenance of Dorman's minor child. There is no evidence of record that this income could not have been used by Dorman in accordance with the trust agreement. His inaction or the lack of compulsion on him to act in this respect cannot excuse him. In the circumstances the Commissioner's *81 determination that petitioner is taxable upon all the trust income must be sustained. Decision will be entered under Rule 50. Footnotes
*. Gross income subject to Victory Tax was also increased $12,720.51.↩
1. SEC. 167. INCOME FOR BENEFIT OF GRANTOR. (c) Income of a trust shall not be considered taxable to the grantor under subsection (a) or any other provision of this chapter merely because such income, in the discretion of another person, the trustee, or the grantor acting as trustee or co-trustee, may be applied or distributed for the support or mainenance of a beneficiary whom the grantor is legally obligated to support or maintain, except to the extent that such income is so applied or distributed. * * *↩